# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

L.S., a minor by her mother and next friend
    YASMIN LORENA HERNANDEZ;
GIANCARLO MENDOZA;                          Case No.
G.E.M. a minor by her mother and next friend
    AMALFI MENDOZA;                   Hon.
N.V., a minor by her mother and next friend
    AYDE VERA;
E.T., a minor by his mother and next friend
    OLGA MATHURIN;
C.M.W., a minor by her mother and next friend
    CATHY SANCHEZ;
C.D.W., a minor by her mother and next friend
    JUDYANN WOLF;
A.J.T., a minor by her mother and next friend
    LAURIE JO BRANGAN;
T.M., a minor by his mother and next friend,
    CRYSTAL LUGO;
G.B., a minor by his mother and next friend,
    JENNIFER BARRERA;
AUDREY DIAZ;
B.A.J., a minor by his mother and next friend,
    YUDELQUIS DURAN;
K.J.S.H., a minor by his guardian and next friend,
    JUANITA A. VIVES;
R.D., a minor by his mother and next friend,
    DAWN DeLENA;
K.J.M., a minor by her mother and next friend,
    TANYA McCONNELL;

      *Plaintiffs,*
v.

SCOT PETERSON;
JOHN DOES 1-3;
JAN JORDAN;
ANDREW MEDINA;

1

ROBERT RUNCIE;
SCOTT ISRAEL;
BROWARD COUNTY, a political subdivision
of the State of Florida.

       *Defendants.*
_____/

Kristoffer R. Budhram (125950)
*Attorney for Plaintiffs*
Bank of America Tower
50 N. Laura Street, Suite 2500
Jacksonville, FL 32202
(904) 299-5500
krbudhram@benedettolaw.com

Solomon M. Radner *(pro hac vice to be applied for)*
Michigan Bar No. P73653
EXCOLO LAW, PLLC
*Attorney for Plaintiffs*
26700 Lahser Road, Suite 401
Southfield, MI 48033
(248) 291-9712
sradner@excololaw.com
_____/

## COMPLAINT AND DEMAND FOR JURY TRIAL

      NOW COMES Plaintiffs, by and through their attorneys, complaining of Defendants, and respectfully allege as follows:

## JURISDICTION AND VENUE

    1.    This is a civil rights action in which the Plaintiffs seeks relief for the violation of rights secured by 42 U.S.C. § 1983 and the Fourth and Fourteenth Amendments.

    2.    Jurisdiction of this Court is found upon 28 U.S.C. § 1331.

3.     The events that give rise to this lawsuit took place at the Marjory Stoneman Douglas High School, located at 15901 Pine Island Road, Parkland, Florida, 33076.

4.     Venue is appropriate in the Southern District of Florida pursuant to 28 U.S.C § 1391(b).

## **PARTIES**

5.     Yasmin Lorena Hernandez is the mother and guardian of L.S. and is a resident of Parkland, Florida.  L.S. is a student at Marjory Stoneman Douglas Highschool and a resident of Parkland, Florida.

6.     Giancarlo Mendoza is a student at Marjory Stoneman Douglas Highschool and a resident of Parkland, Florida.

7.     Amalfi Mendoza is the mother and guardian of G.E.M. and is a resident of Parkland, Florida. G.E.M. is a student at Marjory Stoneman Douglas Highschool and a resident of Parkland, Florida.

8.     Ayde Vera is the mother and guardian of N.V. and a resident of Parkland, Florida. N.V. is a student at Marjory Stoneman Douglas Highschool and a resident of Parkland, Florida.

9.     Olga Mathurin is the mother and guardian of E.T. and is a resident of Parkland, Florida. E.T. is a minor and student at Marjory Stoneman Douglas Highschool and a resident of Parkland, Florida.

10.     Cathy Sanchez is the mother and guardian of C.M.W. and is a resident of Parkland, Florida. C.M.W. is a minor and student at Marjory Stoneman Douglas Highschool and a resident of Parkland, Florida.

11.     Judyann Wolf is the mother and guardian of C.D.W. and is a resident of Coral Springs, Florida. C.D.W. is a minor and student at Marjory Stoneman Douglas Highschool and a resident of Coral Springs, Florida.

12.     Laurie Brangan is the mother and guardian of A.J.T. and is a resident of Parkland, Florida. A.J.T. is a student at Marjory Stoneman Douglas Highschool and a resident of Parkland, Florida.

13.     Crystal Lugo is the mother and guardian of T.M. and is a resident of Coral Springs, Florida. T.M. is a minor and student at Marjory Stoneman Douglas Highschool and a resident of Coral Springs, Florida.

14.     Jennifer Barrera is the mother and guardian of G.B. and is a resident of Parkland, Florida. G.B. is a minor and was at all pertinent times a student at Marjory Stoneman Douglas Highschool and a resident of Parkland, Florida.

15.     Audrey Diaz is a student at Marjory Stoneman Douglas Highschool and a resident of Coral Springs, Florida.

16.     Yudelquis Duran is the mother and guardian of B.A.J. and is a resident of Parkland, Florida. B.A.J. is a minor and student at Marjory Stoneman Douglas Highschool and a resident of Parkland, Florida.

17.     Juanita A. Vives is the mother and legal guardian of K.J.S.H. and is a resident of Coral Springs, Florida. K.J.S.H.  is a minor and student at Marjory Stoneman Douglas Highschool and a resident of Coral Springs, Florida.

18.     Dawn DeLena is the mother and mother of R.D. and is a resident of Coral Springs, Florida. R.D. is a minor and student at Marjory Stoneman Douglas Highschool and a resident of Coral Springs, Florida.

4

19.    Tanya McConnell, is the mother and mother of K.J.M. and is a resident of Parkland, Florida. K.J.M. is a minor and student at Marjory Stoneman Douglas Highschool and a resident of Parkland, Florida.

20.    All Plaintiffs were present at Marjory Stoneman Douglas Highschool during the shooting and suffered harm during the shooting in the form of, at least, severe psychological injury and trauma.

21.    Defendant SCOT PETERSON ("Peterson") was at all pertinent times a Broward County deputy and was specifically tasked with protecting the Plaintiffs, even it meant risking his own life. It was and is a heroic job and one upon which people reply in the case of a life and death emergency. He was tasked with the job to protect the children at the school with the knowledge that he was possibly the only armed person in the immediate vicinity of the school. His job duties required him to run towards danger at risk of life and limb, and not to run away from danger for the sole purpose of sole-preservation. His arbitrary and conscience-shocking actions and inactions directly and predictably caused children to die, get injured, and get traumatized. Peterson is employed by the Broward County as a deputy police officer in the Marjory Stoneman Douglas Highschool, and at all times relevant herein was acting under the color of state law.

22.    Defendant JAN JORDAN ("Jordan") was at all pertinent times a Broward County Captain and was commander of the shooting scene. She refused to allow emergency personnel to enter the school, even into the safe areas, to save lives. She was tasked with the job to protect the children at the school; her arbitrary and

conscience-shocking actions and inactions directly and predictably caused children to die, get injured, and get traumatized.

23.    Defendant ANDREW MEDINA ("Medina") was at all pertinent times a Broward County School guard tasked with keeping children safe. His actions and inaction caused children to die, get injured, and get traumatized. Specifically, he failed to stop Shooter, question him, or lock down the school, even though he saw Shooter walk past him and he recognized Shooter to be a known danger to the school. He instead radioed ahead to warn fellow monitor David Taylor that a suspicious kid was headed his way. Medina also could have and should have called a code, which would have caused the school to lock down, thereby making it extremely difficult if not impossible for Shooter to have access to as many victims since they would be behind locked doors. Medina claimed he was ordered to not call a Code unless he actually saw a gun. If that statement is true, that training or policy demonstrates deliberate indifference on the part of Defendant County.

24.    Defendant ROBERT RUNCIE ("Runcie") was at all pertinent times the superintendent of Marjory Stoneman Douglas High School, and charged with the tasks of, among other things, ensuring the safety and well-being of the students and faculty.

25.    Defendant SCOTT ISRAEL ("Israel") was at all pertinent times the Broward County Sheriff and the decisionmaker and/or policymaker for Broward County. Israel's job duties require him to properly train and supervise his subordinates to, among other things, ensure the safety of the public, including the students at Marjory Stoneman Douglas Highschool.  His arbitrary and conscience-

6

shocking actions and inactions directly and predictably caused children to die, get injured, and get traumatized.

26.   Defendant, BROWARD COUNTY ("County"), is a political subdivision of the State of Florida, and at all times relevant herein, was acting under color of state law. Defendant County's policies and procedures, and training or lack thereof, demonstrated deliberate indifference to the rights Plaintiffs, and that deliberate indifference caused the herein complained-of harm to take place.

27.   Each of the Defendants' complained of actions were done intentionally, knowingly, recklessly, wantonly, with deliberate indifference, arbitrarily, and in a manner that shocks the conscience of the court in a constitutional sense.

## FACTUAL BACKGROUND

### The Unlawful Search and Seizure

28.   On February 14, 2018 at about 7:43 AM, T.M. arrived at Marjory Stoneman Douglas Highschool ("school").

29.   The school day started at 7:40 AM and T.M. was a few minutes late.

30.   T.M. walked to his first class for the day which was weight training.

31.   Upon his arrival to the gym locker room, T.M. was not able to change his clothes because he was pulled out of class and escorted to the office for questioning.

32.   When he arrived at the office, there were about ten (10) to fifteen (15) students also waiting to be questioned. Upon information and belief, the students were called in one at a time to the office and were interrogated and searched by a member of the school's staff.

33.   T.M. was brought to the office and his backpack was searched by faculty.

34.   T.M. was not free to leave and not permitted to contact his attorney.

35.   T.M. was then detained by Defendant Peterson who took two-hundred dollars ($200) from T.M.'s backpack and conducted a custodial interrogation for approximately one hour.

36.   Defendant Peterson also searched T.M.'s bag.

37.   T.M. explained to Defendant Peterson that he had the money to take his high-school girlfriend out for a Valentine's Day dinner after school.

38.   Defendant Peterson persistently accused T.M. of selling drugs.

39.   Defendant Peterson demanded that T.M. name those to whom he sold and if he did he would not be in trouble.

40.   T.M. explained to Defendant Peterson that he was late to school that day, so he could not and did not sell anything.

41.   Defendant Peterson told T.M. that he could search everyone in T.M.'s weight training class and that he only needed one student to say they got it from T.M. in order to pin it on him.

42.   Defendant Peterson did not return the money to T.M. but instead put it in an envelope that he said may only be picked up by T.M.'s mother, Ms. Lugo.

43.   T.M. explained that he needed the money for his dinner and Defendant Peterson said in reply "well that sucks."

44.   At or around 9:30 a.m., Defendant Peterson also called Ms. Lugo to inquire about the money in T.M.'s bag.

45.     Ms. Lugo again explained that the money was for T.M. to take his girlfriend out to dinner and that he was going to open his own bank account in the near future.

46.     Defendant Peterson accused T.M. of selling drugs and alleged that Ms. Lugo was lying to protect T.M.

47.     Defendant Peterson asserted that T.M. is not manly enough to own up to what he did and that he doesn't like students like T.M. because they look good on paper but are actually really bad kids.

48.     Defendant Peterson sent T.M. to in-school suspension for possessing late passes in his bag which was against school policy.

49.     Defendant Peterson eventually returned the money to T.M., apparently realizing that he had seized T.M.'s money unlawfully.

## THE SHOOTING

50.     On February 14, 2018, at around 2:20 p.m., a former student who will not be named and will be referred to herein as "Shooter" arrived at Marjory Stoneman Douglas High School in Parkland, Florida, with the intention of committing a mass killing. Shooter was armed with a semi-automatic rifle and multiple magazines.

51.     Shooter is a former student of Marjory Stoneman Douglas High School who, upon information and belief, had been expelled from the school in 2017 for disciplinary reasons.

52.     Upon information and belief, before Shooter's expulsion, school administrators banned Shooter from wearing a backpack on campus because he had made threats against other students. The school's superintendent, Defendant Runcie, and Broward County sheriff, Defendant Israel, were both well aware of the potential danger Shooter posed to the school and its students and faculty, yet they did nothing meaningful to enhance security from this known threat.

53.     Further, Runcie and Israel, at all pertinent times, were the decisionmakers and/or policymakers for the school and County, respectively. They were charged with the job to train and supervise their subordinates to, among other things, ensure the safety of the students at the school.

54.     Runcie was responsible to ensure the schoolgrounds were safe from events such as the one described in this action. He did not. In fact, he had been warned by multiple credentialed and experienced individuals that the schoolgrounds were not up to par regarding safety, particularly concerning school shooting scenarios.

55.     Runcie's arbitrary and conscience-shocking actions and inaction predictably allowed shooter to cause the harm caused in this action. Further, Runcie, acting as decisionmaker and policymaker for the school, thereby demonstrated deliberate indifference to the students' safety. This deliberate indifference predictably allowed the complained-of incident to happen.

56.     Israel was charged with ensuring he provided adequate security to the school. Instead, Israel provided Peterson, who was absolutely not adequate to provide security to the school. In fact, Peterson was known in certain law

enforcement circles as "Rod" which is an acronym for "retired on duty" due to the lackadaisical nature with which he approached the task.

57.    Peterson would regularly illustrate for the students how tough he was, but clearly avoided any potential danger he may face.

58.    Before Shooter's expulsion, a neighbor called the Broward County Sherriff's Office to report an Instagram post in which Shooter said he planned to shoot up the school and nothing was done by Defendants in response to her warning.

59.    After Shooter's November 30, 2017 expulsion, the Broward County Sherriff's Office received a call from a tipster in Massachusetts who warned them that Shooter was collecting guns and knives and could be a school shooter in the making. The deputy referred that tipster to a different Florida Sherriff's office.

60.    The Broward County Sherriff's office received many dozens of calls warning them about Shooter from 2008 to 2017 and they did nothing to ensure that Shooter did not live out his sick dream of shooting up the school.

61.    On the day of the shooting, Shooter took an Uber to the school and walked to the school's 1200 building carrying a large duffel bag and a backpack. What followed was about eight minutes of hell as follows:

- 2:19 Shooter arrived at the school in an Uber.

- 2:21:19 Shooter enters the East building and went to stairwell 1200B.

- 2:21:35 Shooter stands in front of room 1217, kills three students who were standing in doorway of 1215 and injures one who was in the hallway just past the door to room 1212, who tried to take cover first in room 1209 and then took cover in room 1210.

- 2:21:40 Shooter stands in the entry of room 1216 where there are eight students, injures three students, kills one, traumatizes four.

- 2:22:20 Shooter stands in the doorway of room 1214 where there are six students and in less than five seconds, murders two and injures four.

- 2:22:40 Shooter returns to room 1216 and kills two of the four uninjured students, and injures the other two.

- 2:22:51 a teacher enters the hallway from the other end and is injured by Shooter, and takes cover in doorway of room 012C.

- 2:22:55 Shooter stands again in doorway of 1214 for about five seconds before leaving again.

- 2:23:05 Shooter stands in doorway of room 1213 where there are four students, kills one and injures three.

- 2:23:21 Shooter walks down hallway and kills the teacher who was injured who was taking cover in doorway of room 012C.

- 2:23:25 Shooter enters 1200A at the same time as a teacher entered through a different door and immediately kills the teacher.

- 2:23:37 Shooter exited 1200A stairwell on second floor and made his way down the hall checking each classroom for occupants and entered stairwell 1200B at 2:24:18.

- 2:24:30 Shooter exits stairwell 1200B on third floor and while standing in hallway by stairwell, shot and inured student standing in doorway of room 1255 and kills teacher standing in doorway of 1256, and injures four more students down the hallway; around 21 students down the hall and seven run

12

into room 1255, one inured student takes cover in the doorway of 1247, one injured student stays in the middle of the hallway, and the remaining students congregate by the doorways of 1249 and 1250.

- 2:24:39 Shooter stands by doorway of 1255 for about 3 seconds but does not enter.

- 2:24:40 Shooter turns around and looks into room 1256 and then continues back towards the stairwell before turning back towards the hall and shooting again at students.

- 2:24:55 Shooter starts down the hall again but stops and starts shooting from in front of room 1256, and around ten uninjured students start running towards the 1200A stairwell, seven remain in 1250, seven (including one injured) remain in room 1255, the four injured students down the hallway remain where they are: one in the doorway of 1247, one in the middle of the hallway, and two in the doorway of room 1249.

- 2:24:59 of the ten students who run for stairwell 1200A, seven make it out uninjured, one makes it out injured, and two are killed right by the stairwell and then he again stands by the doorway of room 1255 for around five seconds before taking off down the hall again towards stairwell 1200A.

- 2:25:09 Shooter takes off down the hallway west towards stairwell 1200A and kills the two injured students by the doorway of room 1249 and also kills the student by the doorway to room 1247.

- 2:25:40 Shooter enters room 1240 and leaves at 2:27:32.

- ▪ 2:27:36 Shooter enters stairwell 1200A and exits from the first floor door at 2:27:55.
- ▪ 3:39 Shooter was caught and arrested some time later by Coconut Creek and Coral Springs Police Officers.

## LAW ENFORCEMENT FAILURES

62. Numerous failures by numerous government actors, including law enforcement, strongly continued to Shooter's ability to carry-out this horrific attack, without which this attack could not have happened.

63. Defendant Medina allowed Shooter to walk right into the 1200 building without stopping him, despite the fact that Medina recognized Shooter as a bad kid who was potentially dangerous and would want to shoot up a school. Medina did not even call in a code, which would have put the school on lockdown and prevented most if not all of the harm from occurring.

64. Defendant Medina watched Shooter walk in and described it as a "B-line" as though "he was on a mission" so he tried to drive a golf cart to Shooter, but that only made Shooter pick up the speed.

65. He radioed that a suspicious person was walking in through the east side holding a black bag. When Shooter saw the golf cart, Shooter started to run and then it was "not even a minute", when Medina heard the first pop. During that "not even a minute" there was still plenty of time to reach Shooter and neutralize him before Shooter would have been able to remove his gun from the bag.

66. Medina further explained that he immediately "knew the kid from the school from last year" and that at a meeting from the year prior there was consensus

14

that if anyone would shoot up the school, it would be Shooter, and STILL Medina did nothing, not even call a code. Medina did however have enough time to text other security officers about who the suspicious person was, again instead of approaching Shooter or calling a code.

67.     Even after hearing the first several shots ring out through the school's hallways, Medina still didn't call in a code because he claims he didn't see a gun. This lack of training demonstrates deliberate indifference on the parts of Israel, Runcie and the County. Alternatively, a policy not allowing Medina to call a code unless he SEES a gun, further demonstrates deliberate indifference to the Plaintiffs.

68.     Defendant Peterson and the three John Doe's stood by outside the school while the students were being gunned down by Shooter one at a time, with their guns drawn, but taking literally no actions to prevent Shooter from marching through the three floors of the 1200 building, taking his time, and murdering seventeen students and injuring many more.

69.     Coral Springs Police Officer Wilkins and Coral Springs Sergeant Mazzei rushed past four Broward County Sheriff ("BSO") deputies who were hiding to keep themselves safe at the expense of the safety of the students, by taking up exterior positions behind their vehicles. Wilkins was advised by an unknown BSO Deputy taking cover behind a tree, "he is on the third floor", which establishes that BSO did in fact know where Shooter was and proves that Peterson's claims he made after the shooting, that he did not know where Shooter was, were untrue.

70.     Peterson has switched his account of his actions and inactions on February 14, 2017 based on what information was available to the public. First, he

explained that he did not enter the 1200 building to confront the shooter because he believed the shooter was in the area of the football field. "I was scanning for the shooter, looking over the windows, the sidewalk, the rooftop. I thought maybe it was a sniper like in Las Vegas." This implies that his goal was to attack the shooter, but he did not know where the shooter was. Then Peterson said that he was attempting to seek cover and assess the situation, as he claimed he was trained by Israel and the county.

71.     Peterson subsequently claimed, that contrary to what Israel had announced was the policy, that The Broward County Sheriff's Office, or BSO, "trains its officers that in the event of outdoor gunfire one is to seek cover and assess the situation in order to communicate what one observes to other law enforcement," DiRuzzo said.

72.     Peterson acted consistent with his training and "took up a tactical position between the 700-800 buildings corridor/corner," Peterson said. He was the first officer to advise dispatch that he heard shots fired, and he initiated a "Code" to lock down the campus, according to the statement.

73.     President Trump also lambasted Peterson by proclaiming that Peterson had "choked" which is accurate.

74.     Israel referred to Peterson as a "disgrace" for standing outside and not going in. This is perhaps the truest thing Israel has said about this tragedy.

75.     Peterson claimed:

- That he initially "received a call of firecrackers — and not gunfire — in the area of the 1200 Building."

- In response to the firecracker call Mr. Peterson along "with Security Specialist Kelvin Greenleaf exited the 100 Building and ran north the couple of hundred yards to the 1200 Building."
- Upon arriving at 1200 Building Mr. Peterson "heard gunshots but believed that those gunshots were originating from outside of any of the buildings on the school campus."
- BSO trains its officers that in the event of outdoor gunfire one is to seek cover and assess the situation in order to communicate what one observes to other law enforcement.
- Consistent with his training, Mr. Peterson "took up a tactical position between the 700-800 buildings corridor/corner."
- Peterson was the first BSO officer to advise BSO dispatch that he heard shots fired.
- Peterson "initiated a 'Code' lockdown of the entire school campus."

76.   Peterson has claimed that he remained outside because a) He believed the shooter was inside; and b) because the believed the shooter was outside.

77.   Defendant Jordan prevented emergency responders from entering the 1200 building to either confront Shooter or to aid the victims.

78.   While the shooting was happening, Coral Springs deputy fire chief Michael McNally ("McNally") repeatedly asked Captain Jan Jordan for permission to send his medics inside the school but was rebuffed by Jordan.

79.     McNally kept asking for permission for additional medics for additional specially trained medics to go into rooms that had already been searched and found to be safe, but Jordan did not approve this request either.

80.     McNally asked Jordan six times for permission to enter all to no avail.

81.     Further, when Margate police officer Chad Ryen arrived, he informed Jordan that he was a SRT/SWAT operator and there was no time to wait. He then made the determination to enter the school.

82.     The Broward County Sherriff's Office policy on active shooters indicates responding deputies may enter the building to preserve life without permission. The policy does not list staging yet Jordan chose to stage, in violation of policy, due either to her grossly inadequate training or her deliberate indifference.

83.     Defendants Israel and Broward County demonstrated deliberate indifference through their policies and procedures and through their inadequate training and supervision. That deliberate indifference caused the herein complained-of harm.

84.     Israel has continually attempted to credit himself while placing blame on others. In his haste to shift the blame to his subordinate, Israel confirmed what many already believed to be fact, IE that Peterson was so inadequately trained by both the County and by Israel, that he was in no position to do the job which he was tasked to do, IE protect the school. He further confirmed that Peterson was supposed to run towards the shooter to confront him, not away from him. Incidentally, this also confirms that Jan Jordan, who notoriously gave the "stage" order instead of ordering the officers on-scene to enter the school to neutralize Shooter, also did not

18

act appropriately. She too was so poorly trained by Israel and the County that she too was incapable of adequately conducting the tasks which she was assigned. Alternatively, she was properly trained and she arbitrarily and in a manner that shocks the conscience, gave the "stage" order which allowed the nightmare to continue. Those injured continued to suffer, and those traumatized, continued to be traumatized well past the point where the trauma could have ended, had the officers on-scene been permitted by Jordan to enter the building. Israel publicly declared in 2015 about Peterson "Your dedication and allegiance are the best illustrations of the service [the sheriff's office] provides to the people of Broward County." Sadly, this is true, and forms a basis of liability in the instant action.

85.    Eventually, Coral Springs fire officials released records which further demonstrated how chaotic the County's handling of this matter was. One of the documents states the Broward Sheriff's Office failed to set up an effective central command post, contributing to the confusion and frustration among the medics. The same issue was a problem in the January 2017 Fort Lauderdale airport killings - the last major shooting the Sheriff's Office handled.

86.    By the time the whole building was deemed safe for them to enter, there was no need - everyone had already been brought out by police or was dead. Some of that blood is on Jordan's hands, as is the trauma that the victims suffered for an unnecessarily prolonged period of time.

87.    Defendant Israel and Defendant Broward County either have a policy that allows killers to walk through a school killing people without being stopped. Or they have such inadequate training that the individuals tasked with carrying out the

polices, such as Medina, Peterson and Jordan, lack the basic fundamental understandings of what those policies are such that they are incapable of carrying them out.

88.   Superintendent Runcie and Sherriff Israel were aware of the terrible lack of security at the school and yet chose not to fix it. In fact, they had been warned multiple times by multiple experts that the school was a primary target for a school shooting and that the school's security was woefully inadequate. Runcie and Israel did nothing to address the issues.

89.   Further, Runcie and Israel knew that Shooter in particular posed a school-shooting threat, especially since the school was so woefully unprepared for such an attack, and yet Runcie and Israel continued to do nothing to address the numerous security concerns.

## COUNT I
## VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. § 1983
### (Fourth Amendment – Unlawful Detention)

### *(T.M. Against Defendants Peterson, and County)*

90.   Plaintiffs hereby incorporate herein all the prior allegations.

91.   The Fourth Amendment requires police officers and agents of the law to possess sufficient probable cause before placing a criminal suspect under arrest or detainment.

92.   At all times relevant, Plaintiffs had a clearly established right to liberty, including the right to personal safety and bodily integrity, as well as protection from

unlawful seizure, unnecessary force, unreasonable force pursuant to the Fourth Amendment to the United States Constitution.

93.    At all times relevant, as a police officer acting under the color of law, Defendant Peterson was required to obey the laws of the United States.

94.    Defendants intentionally, knowingly, maliciously, recklessly, unreasonably, and/or gross negligently detained and/or arrested Plaintiff without a warrant or any lawful basis.

95.    Plaintiff was escorted through the school and to different administrative offices, was confined to the office, and was not free to leave or return to class and was therefore arrested and/or detained.

96.    Plaintiff was detained by Defendants for having money in his bag.

97.    Plaintiff was not given the opportunity to have an attorney present during Defendant's interrogation which lasted several hours.

98.    Plaintiff's arrest was based on Defendants' knowing, deliberate, and reckless disregard for the truth.

99.    Further, the Defendants had no knowledge of any fact or circumstance which would lead a reasonable person to believe that Plaintiff committed any offense, whatsoever.

100.  Defendants intentionally detained Plaintiff and/or had Plaintiff arrested with the intention of confining him within the fixed boundaries of the administrator's office, and kept him confined in their custody for three (3) hours before releasing him to I.S. for a minor issue unrelated to the investigation.

101.   Additionally, Defendants' conduct in arresting and confining Plaintiff deprived him of his liberty without consent, probable cause, reasonable suspicion, legal justification, just cause, or any other legally valid reason.

102.  All the aforementioned acts deprived Plaintiff of the rights, privileges and immunities guaranteed to citizens of the United States by the Fourth, Fifth and Fourteenth Amendments to the Constitution of the United States of America, and in violation of 42 U.S.C. § 1983.

103. The acts complained of were carried out by the aforementioned Defendant Peterson in his capacity as a police officer, with the entire actual and/or apparent authority attendant thereto.

104.  The acts complained of were carried out by Defendant Peterson in his capacities as a deputy police officer, pursuant to the customs, usages, practices, procedures, and the rules of the Broward County Sherriff's Department, all under the supervision of ranking officers of said department.

105.  Defendants collectively and individually, while acting under the color of state law, engaged in conduct that constituted a custom, usage, practice, procedure or rule of the respective municipality/authority, which is forbidden under the Constitution of the United States.

106.  Defendants' actions constituted an unlawful arrest and/or detention of Plaintiff.

107.  As a proximate result of the illegal and unconstitutional acts of the Defendants, Plaintiff T.M. suffered harm.

## COUNT II
## VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. § 1983
## (Fourth Amendment – Unlawful Search of Backpack)

### *(T.M. Against Defendants Peterson and County)*

108.  Plaintiffs hereby incorporate herein all the prior allegations.

109.  The Fourth Amendment requires police officers to possess sufficient probable cause or reasonable suspicion before searching the property of a criminal suspect in a school setting.

110.  Defendant Peterson intentionally, knowingly, and maliciously, recklessly, unreasonably, and/or gross negligently searched Plaintiff's bag without reasonable suspicion or probable cause.

111.  Defendant Peterson searched Plaintiff's bag in violation of Plaintiff's Fourth Amendment rights.

112.  At all times relevant, Plaintiff had a clearly established right to liberty, including unlawful search pursuant to the Fourth Amendment to the United States Constitution.

113.  At all times relevant, as a police officer acting under color of law, Defendant Peterson was required to obey the laws of the United States.

114.  The acts complained of were carried out by Defendant Peterson in his capacity as a police officer, with the entire actual and/or apparent authority attendant thereto.

115.  The acts complained of were carried out by Defendant Peterson in his capacity as a police officer, pursuant to the customs, usages, practices, procedures,

and the rules of the Broward County Sheriff's Department, all under the supervision of ranking officers of said department.

116.  Defendant Peterson, while acting under the color of state law, engaged in conduct that constituted a custom, usage, practice, procedure or rule of the respective municipality/authority, which is forbidden under the Constitution of the United States.

117.  In violation of Plaintiff's clearly established constitutionally-protected right to be free unreasonable search and seizure without due process of law under the Fourth Amendments to the United States Constitution, Defendant Peterson and Broward County Sheriff's Office unlawfully seized and searched Plaintiff's person and property.

118.  As a proximate result of the illegal and unconstitutional acts of the Defendants, Plaintiff T.M. suffered harm.

## COUNT III
## VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. § 1983
### (Fourth Amendment – Unlawful Seizure of Money)

### (T.M. Against Defendant Peterson and County)

119.  Plaintiffs hereby incorporate herein all the prior allegations.

120.  The Fourth Amendment requires police officers to possess sufficient probable cause or reasonable suspicion before seizing the property of a criminal suspect in a school setting.

121. Defendant Peterson intentionally, knowingly, and maliciously, recklessly, unreasonably, and/or gross negligently seized Plaintiff's money without a warrant or any lawful basis.

122. At all times relevant, Plaintiff had a clearly established right to liberty, including unlawful seizure pursuant to the Fourth Amendment to the United States Constitution.

123. At all times relevant, as a police officer acting under color of law, Defendant Peterson was required to obey the laws of the United States.

124. The acts complained of were carried out by Defendant Peterson in his capacity as a deputy police officer, with the entire actual and/or apparent authority attendant thereto.

125. The acts complained of were carried out by Defendant Peterson in his capacity as a deputy police officer, pursuant to the customs, usages, practices, procedures, and the rules of the Broward County Sherriff's Office, all under the supervision of ranking officers of said department.

126. Defendant Peterson, while acting under the color of state law, engaged in conduct that constituted a custom, usage, practice, procedure or rule of the respective municipality/authority, which is forbidden under the Constitution of the United States.

127. In violation of Plaintiff's clearly established constitutionally-protected right to be free from punishment and deprivation of life, liberty, and property without due process of law under the Fourth Amendments to the United States Constitution, Defendant Peterson unlawfully seized Plaintiff's property.

128.  As a proximate result of the illegal and unconstitutional acts of the Defendants, Plaintiff suffered harm.

## COUNT IV
## VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. § 1983
## (Municipal Liability-Policy of Unlawful Search and Seizure)

### (Against Defendant County)

129.   Plaintiffs hereby incorporate herein all the prior allegations.

130.  A municipality is liable under 42 U.S.C. § 1983 if the acts that violated a person's rights are attributable to its own policies, practices, and customs.

131.  At all times relevant to this complaint, Defendant Broward County acted with deliberate indifference to Plaintiff's constitutional rights by maintaining policies, practices, and customs that condoned and fostered Defendant Peterson's conduct, or alternatively the training provided to Peterson was so grossly inadequate that he was not prepared to handle the assigned tasks.

132.  Defendant Broward County permitted Defendant Peterson to carry out searches and seizures without a warrant, probable cause, reasonable suspicion or any legal basis.

133.  This custom and policy of baseless searches and seizures of student's person and personal property was standard operating procedure for Defendant Peterson, a deputy police officer, and directly caused him to deprive Plaintiff of constitutionally-protected rights as described herein.

134.  In the alternative and at all times relevant to this complaint, Defendant Broward County, did not in fact have such a policy in place, but failed to properly

train Defendant Peterson, a deputy police officer in a school setting, thereby demonstrating deliberate indifference to Plaintiff's rights.

135. Defendant Broward County failed to: (a) adequately supervise and train its officers and agents, specifically Defendant Peterson, a deputy officer, thereby failing to adequately discourage further constitutional violations on the part of its officers; and (b) properly and adequately monitor and discipline its officers.

136. Defendant Peterson unconstitutionally searched and seized Plaintiff's person and belongings without any legal basis.

137. As is being pled in this alternative, the fundamental lack of knowledge of such basic constitutional rights by a deputy such as Peterson, could only be the by-product of Broward County's failure to adequately train Peterson before putting him the position in which he was placed by the defendant County.

138. Defendant Broward County failed to properly train its police officers on the proper standard for initiating an investigation of a criminal suspect, when and how to seize their property, and how to preserve their property unless and/or until an order to destroy such property is entered by a court of competent jurisdiction.

139. Defendant Broward County's failure to adequately supervise and train its police officers on the proper procedures for investigations and criminal investigations caused Defendant Peterson to violate Plaintiff's Constitutional rights.

140. As a result of Defendant Broward County's failure to adequately train or correct an unlawful policy, Plaintiff was harmed.

## COUNT V
## VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. § 1983
### (Arbitrary Or Conscience-Shocking Conduct)

### *(Against All Defendants for the Shooting)*

141.  Plaintiffs hereby incorporate herein all the prior allegations.

142.  A state or local official is liable under 42 U.S.C. § 1983 if the acts that perpetrated a violation of a person's rights were arbitrary or conscience shocking.

143.  At all times relevant, Plaintiffs had a clearly established right to liberty, including their rights to personal safety and bodily integrity, as well as protection from unlawful seizure pursuant to the Fourth Amendment to the United States Constitution.

144.  Plaintiffs were seized in that they suffered harm, physical and/or emotional by being shot at or by being in such close proximity to the shooting.

145.  At all times relevant to this complaint, Defendant Peterson, as a deputy police officer stationed at a public high school and acting under the color of law, had a duty to perform his job and obey the laws of the United States.

146. Defendants acted with extreme deliberate indifference to Plaintiffs constitutional rights by knowingly failing to engage with a recognized threat and intentionally evading his duties to protect the students and staff of Marjory Stoneman Douglas Highschool.

147.  Defendant Medina's failure to detain and/or stop and/or engage with a known and recognized threat inside of a public high school shocks the conscience.

148. Defendant Peterson's intentional evasion of his official duties, i.e. intentionally hiding while the shooter was actively shooting students and school staff knowing he was the only person at the school with access to weapons for defense, shocks the conscience.

149. Defendant John Does 1-3 acted arbitrarily and in a manner that is conscience-shocking by hiding instead of confronting Shooter.

150. Defendant Jordan's order to "stage" instead of to attack the shooter was both arbitrary and conscience-shocking.

151. Defendant Runcie's and Defendants Israel's apathetic approach to dealing with known threats, instead of taking safety measures, is arbitrary and conscience-shocking.

152. Defendant County, through its policymaker and decisionmaker, enacted policies, both in the form of actual policy, and in the form of woefully inadequate training, that demonstrated deliberate indifference to the rights of Plaintiff and that deliberate indifference caused the herein complained-of harm.

153. Defendants' actions and/or inactions were directly related to and a proximate cause of the deaths and injuries sustained by the students and staff of Marjory Stoneman Douglas Highschool.

154. As a result of Defendant Peterson's actions and/or inactions, Plaintiffs were injured and seek compensatory and punitive damages in addition to reasonable attorney's fees.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff, Chrystal Lugo as guardian of T.M., demands judgment and prays for the following relief, jointly and severally, against all Defendants:

      a.    Full and fair compensatory damages in an amount to be determined by a jury;

      b.    Punitive damages in an amount to be determined by a jury;

      c.    Reasonable attorney's fees and costs of this action; and

      d.    Any such other relief as appears just and proper.

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury of all triable issues, per Fed. R. Civ. P. 38(b).

Respectfully Submitted,

Dated: July 11, 2018

 */s/ Kristoffer  R.  Budhram*
Kristoffer R. Budhram (125950)
*Attorney for Plaintiffs*
Bank of America Tower
50 N. Laura Street, Suite 2500
Jacksonville, FL 32202
(904) 299-5500
krbudhram@benedettolaw.com

*/s/ Solomon M. Radner*
Solomon M. Radner (*pro hac vice pending*)
EXCOLO LAW, PLLC
Attorney for Plaintiff
26700 Lahser Road, Suite 401
Southfield, MI 48033
(248) 291-9712
sradner@excololaw.com

30