# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No. 18-cv-61577-BLOOM/Valle

L.S., a minor by her mother and
next friend YASMIN LORENA
HERNANDEZ, *et al.*,

      Plaintiffs,

v.

SCOT PETERSON, *et al*,

      Defendants.

_____/

## OMNIBUS ORDER ON MOTIONS TO DISMISS

**THIS CAUSE** is before the Court upon five Motions to Dismiss filed by Defendants Andrew Medina ("Medina"), ECF No. [16]; Superintendent Robert Runcie ("Runcie"), ECF No. [27]; Sheriff Scott Israel ("Israel") and Captain Jan Jordan ("Jordan"), ECF No. [33]; Broward County (the "County"), ECF No. [40]; and Scot Peterson ("Peterson"), ECF No. [42] (collectively, the "Motions"). The Court has carefully reviewed the Motions, all opposing and supporting submissions, the record in this case and the applicable law, and is otherwise fully advised. For the reasons set forth below, the Motions filed by Medina, Runcie, Israel and Jordan and the County are granted, and the Motion filed by Peterson is granted in part and denied in part.

## I.      BACKGROUND

This case arises in part from the tragic events that took place on February 14, 2018 at Marjory Stoneman Douglas High School (the "High School") in Parkland, Florida. By now, the

events surrounding the school shooting are ubiquitous; nevertheless, the Court sets forth the relevant facts as alleged by Plaintiffs.

Plaintiffs are fifteen students present during the school shooting perpetrated by Nikolas Cruz ("Cruz"). As a result, the students allege that each suffered psychological injuries. *See* First Amended Complaint, ECF No. [8] ¶¶ 5-20. Cruz, a former student, traveled to the High School in an Uber carrying a duffel bag and backpack. *Id.* ¶ 61. Upon arrival, he entered the school grounds and proceeded to the 1200 building, where he shot and killed seventeen students and school staff members, and injured seventeen others over the course of approximately six minutes. *Id.*

Throughout the First Amended Complaint, Plaintiffs detail numerous shortcomings in the official response to the shooting by Defendants. Plaintiffs allege, in pertinent part, that Medina, a school monitor, recognized Cruz as a danger when he arrived at the High School, but rather than attempt to stop Cruz, he only radioed a colleague to report a suspicious person entering the school grounds with a backpack. *Id.* ¶¶ 63-64. Even after the shooting began, Medina did not call a code because he did not see a gun. *Id.* ¶ 67. Peterson, a trained law enforcement school resource officer, remained outside the school building while Cruz was inside shooting students and staff. *Id.* ¶¶ 70-76. Captain Jordan, the commander of the scene, prevented emergency responders from entering the 1200 building to confront Cruz or render aid to victims. *Id.* ¶ 77. Plaintiffs further allege that Israel, Runcie, and the County either have a policy of allowing "killers to walk through a school killing people without being stopped," or that they carry out such inadequate training of the individuals expected to respond in such situations, such as Medina, Peterson, and Jordan, that they should be liable for violations of Plaintiffs' substantive due process rights under the Fourteenth Amendment. *Id.* ¶¶ 87-89; Count IV.

In Count V, Plaintiffs assert a First Amendment Claim for retaliation against Medina based upon reports by two unnamed female students, concerning inappropriate sexual comments and conduct by Medina during school hours. *See id.* ¶ 156. Plaintiffs allege that, as a result, the School Board suspended Medina on the students' behalf. ¶ 157. In retaliation for the unnamed students' report, Medina allowed Cruz, who he knew to be dangerous, to enter the school grounds uninhibited and perpertrate the shooting. *Id.* ¶¶ 158-165.

Plaintiff T.M. individually also asserts three claims against Peterson and the County for violation of his Fourth Amendment rights to be free from unreasonable search and seizure with respect to his detention in the High School office (Count I), an allegedly unlawful search of his backpack (Count II), and seizure of money in his backpack (Count III), on the morning of the shooting.

In the Motions, Defendants seek dismissal of the First Amended Complaint for various reasons, including failure to state a claim, qualified immunity, lack of standing, and shotgun pleading.

## II.    LEGAL STANDARD

Rule 8 of the Federal Rules requires a pleading to contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Although a complaint "does not need detailed factual allegations," it must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (explaining that Rule 8(a)(2)'s pleading standard "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation"). In the same vein, a complaint may not rest on "'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (quoting

*Twombly*, 550 U.S. at 557 (alteration in original)).  The Supreme Court has emphasized that "[t]o survive a motion to dismiss a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Id*. (quoting *Twombly*, 550 U.S. at 570); *see also Am. Dental Assoc. v. Cigna Corp.*, 605 F.3d 1283, 1288-90 (11th Cir. 2010).

When reviewing a motion to dismiss, a court, as a general rule, must accept the plaintiff's allegations as true and evaluate all plausible inferences derived from those facts in favor of the plaintiff.  *See Chaparro v. Carnival Corp.*, 693 F.3d 1333, 1337 (11th Cir. 2012); *Miccosukee Tribe of Indians of Fla. v. S. Everglades Restoration Alliance*, 304 F.3d 1076, 1084 (11th Cir. 2002); *AXA Equitable Life Ins. Co. v. Infinity Fin. Grp., LLC*, 608 F. Supp. 2d 1349, 1353 (S.D. Fla. 2009) ("On a motion to dismiss, the complaint is construed in the light most favorable to the non-moving party, and all facts alleged by the non-moving party are accepted as true."); *Iqbal*, 556 U.S. at 678.  Although the court is required to accept as true all allegations contained in the complaint, courts "are not bound to accept as true a legal conclusion couched as a factual allegation."  *Twombly*, 550 U.S. at 555; *Iqbal*, 556 U.S. at 678.  In addition, "courts may infer from the factual allegations in the complaint obvious alternative explanations, which suggest lawful conduct rather than the unlawful conduct the plaintiff would ask the court to infer."  *Am. Dental Ass'n*, 605 F.3d at 1290 (citing *Iqbal*, 556 U.S. at 682).

## III.    ANALYSIS

### A.  Count IV of the First Amended Complaint is a Shotgun Pleading

As a threshold matter, the Court notes that Plaintiffs engage in a quintessential form of shotgun pleading because they incorporate two separate claims against all Defendants in Count IV—one based upon violation of Fourth Amendment rights and the other based upon violation of Fourteenth Amendment rights.  *See Weiland v. Palm Beach Cty. Sheriff's Office*, 792 F.3d 1313,

1321-24 (11th Cir. 2015) (setting forth the four most common types of shotgun pleadings). The Eleventh Circuit has repeatedly and unequivocally condemned shotgun pleadings as a waste of judicial resources. "Shotgun pleadings, whether filed by plaintiffs or defendants, exact an intolerable toll on the trial court's docket, lead to unnecessary and unchannelled discovery, and impose unwarranted expense on the litigants, the court and the court's parajudicial personnel and resources. Moreover, justice is delayed for the litigants who are 'standing in line,' waiting for their cases to be heard." *Jackson v. Bank of Am., N.A.*, 898 F.3d 1348, 1356-57 (11th Cir. 2018) (quoting *Cramer v. Fla.*, 117 F.3d 1258, 1263 (11th Cir. 1997)).

Upon this basis alone, Count IV of the First Amended Complaint is due to be dismissed. Nevertheless, in the interests of conserving judicial resources, the Court considers the merits of the theories asserted throughout the First Amended Complaint.

### B. Plaintiffs' Fourteenth Amendment Claim Does Not Implicate a Constitutional Right (Count IV)

In Count IV, which comprises the bulk of Plaintiffs' claims, Plaintiffs assert a claim under 42 U.S.C. § 1983 for violation of their due process rights pursuant to the Fourteenth Amendement based upon their "clearly established right to be [free] from deliberate indifference to substantial known risks and threats of injury." ECF No. [8] ¶ 143. Plaintiffs maintain that Defendants had a constitutional duty to protect them from school shooters like Cruz. As such, the Defendants' failure to protect them violated their Fourteenth Amendment rights. "[T]o prevail on a § 1983 claim against a local government entity, a plaintiff must prove both that her harm was caused by a constitutional violation and that the government entity is responsible for that violation." *Wyke v. Polk Cty. Sch. Bd.*, 129 F.3d 560, 568 (11th Cir. 1997). Defendants argue, in pertinent part, that Plaintiffs' due process claim fails because there is no constitutional duty to

protect students from harm inflicted by third parties. Because the determination of this issue is dispositive, the Court considers it first.

"The Supreme Court's interpretation of [the Due Process Clause of the Fourteenth Amendment] explicates that the amendment provides two different kinds of constitutional protection: procedural due process and substantive due process." *McKinney v. Pate*, 20 F.3d 1550, 1555 (11th Cir. 1994).[1] "The substantive component of the Due Process Clause protects those rights that are 'fundamental,' that is rights that are 'implicit in the concept of ordered liberty.'" *Id.* at 1556 (quoting *Palko v. Conn.*, 302 U.S. 319, 325 (1937)). "The Due Process Clause protects individuals against arbitrary exercises of government power, but only the most egregious official conduct can be said to be arbitrary in the constitutional sense." *T.W. ex rel. Wilson v. Sch. Bd. of Seminole Cty., Fla.*, 610 F.3d 588, 598, (11th Cir. 2010) (quoting *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 845-46 (1998)) (internal quotations and citation omitted). "[O]nly state action that is an arbitrary exercise of government power which 'shocks the conscience' rises to the level of a substantive due process violation." *City of Fort Lauderdale v. Scott*, 773 F. Supp. 2d 1355, 1365 (S.D. Fla. 2011) (citation omitted). Moreover, both the Eleventh Circuit and the Supreme Court have "said repeatedly that the Fourteenth Amendment is not a 'font of tort law' that can be used, through section 1983, to convert state tort claims into federal causes of action." *Neal ex rel. Neal v. Fulton Cty. Bd. of Educ.*, 229 F.3d 1069, 1074 (11th Cir. 2000); *see also Nix v. Franklin Cty. Sch. Dist.*, 311 F.3d 1373, 1376 (11th Cir. 2002); *Waddell v. Hendry Cty. Sheriff's Office*, 329 F.3d 1300, 1305 (11th Cir. 2003); *Lewis*, 523 U.S. at 848.

---

[1] Although not explicitly stated in the First Amended Complaint, Plaintiffs do not dispute in their responses to the various Motions the characterization that their Fourteenth Amendment claim is a substantive, rather than procedural, due process claim.

As interpreted through case law, the Due Process Clause protects individuals first and foremost from action taken by the state. But,

> nothing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors. The Clause is phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security. It forbids the State itself to deprive individuals of life, liberty, or property without 'due process of law,' but its language cannot fairly be extended to impose an affirmative obligation on the State that those interests do not come to harm through other means.

*DeShaney v. Winnebago Cty. Dept. of Soc. Servs.*, 489 U.S. 189, 195 (1989). Indeed, "[i]ts purpose was to protect people from the State, not to ensure that the State protected them from each other." *Id.* at 196.

To that end, "the only relationships that automatically give rise to a governmental duty to protect individuals from harm by third parties under the substantive due process clause are custodial relationships, such as those which arise from the incarceration of prisoners or other forms of involuntary confinement through which the government deprives individuals of their liberty and thus of their ability to take care of themselves." *White v. Lemacks*, 183 F.3d 1253, 1257 (11th Cir. 1999). Conversely, "where non-custodial relationships are involved, the government can be held liable under the substantive due process clause only where an official's act or omission is arbitrary or conscience-shocking." *Id.* (citation and quotations omitted).

Plaintiffs contend that a substantive due process violation may arise in a non-custodial setting when state actors act with deliberate indifference toward a substantial risk of injury, relying primarily upon *Nix* and *Waddell*. However, in *Nix*, which involved a claim arising in a school setting based upon the acts of a teacher, the Eleventh Circuit reiterated its explicit view that deliberate indifference "is insufficient to constitute a due-process violation in a non-custodial setting[.]" 311 F.3d at 1377. In *Waddell*, although the Eleventh Circuit acknowledged

that disregard for a known and extremely great risk to victims' health or safety might give rise to a violation premised upon deliberate indifference, the court was faced with a very different claim based upon the consequences of actions taken by a confidential informant—and the Court purposely refrained from defining an applicable standard. *See* 329 F.3d at 1306 n.5 ("We do not rule out today that the correct legal threshold for substantive due process in a case like this one is actually far higher."). Simply put, the facts in *Waddell* are not the facts before the Court in the instant case.

Rather, Plaintiffs' First Amended Complaint is replete with allegations—legal conclusions, rather than factual—regarding the arbitrary and conscience-shocking actions and omissions by Defendants in preparing for and responding to the threat of a school shooter like Cruz, about whom Plaintiffs additionally allege Defendants had been warned. *See* ECF No. [8] ¶¶ 52, 58-60. Plaintiffs frame their claim as arising from the actions, or inactions, of Defendants. However, viewed properly, the claim arises from the actions of Cruz, a third party, and not a state actor. Thus, the critical question the Court analyzes is whether Defendants had a constitutional duty to protect Plaintiffs from the actions of Cruz. As previously stated, for such a duty to exist on the part of Defendants, Plaintiffs would have to be considered to be in custody.

Plaintiffs suggest that the essential nature of a public school's role and control over its students requires that schools provide protection and safety for their students. However, the suggestion that school attendance equates to the level of custody implicating a constitutional obligation to protect has been expressly rejected by the Eleventh Circuit. *See Nix*, 311 F.3d at 1378 ("This court has ruled that schoolchildren are not in a custodial relationship with the state."); *Wykes*, 129 F.3d at 569 ("By mandating school attendance, the state simply does not restrict a student's liberty in the same sense that it does when it incarcerates prisoners or when it

commits mental patients involuntarily. Absent that type of restraint, there can be no concomitant duty to provide for the student's 'safety and general well-being.'") (citation omitted); *see also Wright v. Lovin*, 32 F.3d 538, 540 (11th Cir. 1994) (acknowledging that "[t]o date, every federal circuit court of appeal to address the question of whether compulsory school attendance laws create the necessary custodial relationship between school and student to give rise to a constitutional duty to protect students from harm by non-state actors has rejected the existence of any such duty.") (citing cases). And in the context of substantive due process, "it is the State's affirmative act of restraining the individual's freedom to act on his own behalf—through incarceration, institutionalization, or other similar restraint of personal liberty—which is the 'deprivation of liberty' triggering the protections of the Due Process Clause, not its failure to act to protect his liberty interests against harms inflicted by other means." *DeShaney*, 489 U.S. at 200. Therefore, even assuming that Defendants intentionally disregarded warnings about Cruz, Plaintiffs' § 1983 claim fails because they cannot assert the violation of a constitutional right. *See Aracena v. Gruler*, --- F. Supp. 3d ---, 2018 WL 5961040, at *5 (M.D. Fla. Nov. 14, 2018) (finding no due process rights implicated in officer's response to Pulse nightclub shooting because the entire circumstance began and ended with a private actor).

Moreover, this Court cannot ignore that the Supreme Court has been "reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended," and cautioned that the "doctrine of judicial self-restraint requires us to exercise the utmost care whenever we are asked to break new ground in this field." *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 125 (1992) (internal citation omitted). Even in the face of such a senseless tragedy, this Court must respect and adhere to the caution against expanding substantive due process outside the realm of its proper application.

Because the Court determines that Plaintiffs' allegations fail to implicate a constitutional right, the Court does not consider Defendants' additional arguments for dismissal.

### C. Plaintiffs Lack Standing to Assert a First Amendment Retaliation Claim Against Medina (Count V)

Medina argues that Plaintiffs fail to state a claim for retaliation in violation of the First Amendment because Plaintiffs lack standing, the allegations regarding retaliatory conduct are not plausible, and there is no causal connection between Medina's alleged retaliatory conduct and the alleged constitutionally protected speech.

"Standing for Article III purposes requires a plaintiff to provide evidence of an injury in fact, causation and redress[a]bility." *Dermer v. Miami-Dade Cty.*, 599 F.3d 1217, 1220 (11th Cir. 2010) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)). Specifically, "[t]o have standing, a plaintiff must show (1) he has suffered an injury in fact that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to conduct of the defendant; and (3) it is likely, not just merely speculative, that the injury will be redressed by a favorable decision." *Kelly v. Harris*, 331 F.3d 817, 819-20 (11th Cir. 2003); *see Bochese v. Town of Ponce Inlet*, 405 F.3d 964, 980 (11th Cir. 2005) (same). "The elements of a First Amendment retaliation claim are that (1) the plaintiff engaged in speech or an act that was constitutionally protected, (2) the defendant's retaliatory conduct adversely affected the protected speech or act, and (3) there is a causal connection between the retaliatory actions and the adverse effect on the constitutionally-protected speech or act." *O'Boyle v. Sweetapple*, 187 F. Supp. 3d 1365, 1370 (S.D. Fla. 2016) (citing *Bennett v. Hendrix*, 423 F.3d 1247, 1250 (11th Cir. 2005)). Thus, in order for Plaintiffs to have standing to assert their First Amendment claim, they must allege that they engaged in constitutionally protected speech or a constitutionally protected act.

In the First Amended Complaint, Plaintiffs allege that two unnamed female students, who do not appear to be any of the Plaintiffs, reported Medina's inappropriate behavior in February, 2017. ECF No. [8] ¶¶ 156, 159. The First Amended Complaint otherwise contains no allegations of any speech or act in which the Plaintiffs themselves engaged or participated. Therefore, Plaintiffs fail to set forth the first requisite element of their claim. In addition, Plaintiffs lack standing to assert such a claim based upon the speech of two unnamed students.

Nevertheless, Plaintiffs further allege that acting on behalf of all students, the School Board engaged in constitutionally protected conduct by first placing Medina on administrative reassignment pending an investigation, and then suspending him for three days without pay. *Id*. ¶¶ 157-58. The suspension ended February 1, 2018, less than two weeks before the school shooting. *Id*. ¶ 158. Plaintiffs next allege that Medina, in retaliation for the School Board's actions, then intentionally failed to perform his job and deliberately allowed Cruz, who he knew to be dangerous, to enter the High School freely and ultimately commit mass murder. *Id*. ¶¶ 161, 163, 165. However, the School Board is not a party in this case, and therefore cannot properly assert any claims. Moreover, even assuming the School Board had standing, Plaintiffs fail to allege a plausible causal connection between Medina's purported retaliatory conduct and the injuries sustained by Plaintiffs as a result of Cruz's shooting rampage. While confined to accept the allegations as true, the Court expresses a concern as to the the plausibility of such a wicked motivation, which appears to be based on nothing more than pure conjecture. Accordingly, Plaintiffs' First Amendment claim fails.

### D. T.M. States Fourth Amendment Claims Against Peterson[2] (Counts I, II, III)

The County and Peterson move to dismiss T.M.'s Fourth Amendment claims arguing in pertinent part that no Fourth Amendment violation occurred, Peterson is entitled to qualified immunity, and T.M. fails to allege sufficient facts of a policy, custom, or practice to impose municipal liability.

It is well established that the Fourth Amendment applies to searches and seizures conducted by school authorities. *N.J. v. T.J.O.*, 469 U.S. 325, 337 (1985); *see also Ziegler v. Martin Cty. Sch. Dist.*, 831 F.3d 1309, 1319 (11th Cir. 2016) (noting that the "applicable reasonableness principles guide" the analysis of searches and seizures). However, school officials do not need to obtain a warrant before searching a student under their authority. *T.J.O*, 469 U.S. at 340. "[T]he legality of a search of a student should depend simply on the reasonabless, under all the circumstances, of the search." *Id*. at 341. The determination involves a two-part inquiry: "first, one must consider whether the action was justified at its inception [and] second, one must determine whether the search as actually conducted was reasonably related in scope to the circumstances which justified the interference in the first place." *Id*. Thus "[u]nder ordinary circumstances, a search of a student by a teacher or other school official will be 'justified at its inception' when there are reasonable grounds for suspecting that the search will turn up evidence that the student has violated or is violating either the law or the rules of the school." *Id*. at 341-42. Overall, "[w]hile schoolchildren do not shed their constitutional rights when they enter the schoolhouse, Fourth Amendment rights are different in public schools than

---

[2] The Court notes that the only connection between the claims asserted on behalf of T.M. individually and the remainder of the claims premised upon Cruz's actions is that the alleged search and seizure took place on the same day as the shooting. For this reason, Peterson also requests in his Motion that the Court sever these claims; however, because the Court dismisses Plaintiffs' First and Fourteenth Amendment claims, there is no basis to sever.

elsewhere; the reasonableness inquiry cannot disregard the schools' custodial and tutelary responsibility for children." *Bd. of Educ. of Indep. Sch. Dist. No. 92 of Pottawatomie Cty. v. Earls*, 536 U.S. 822, 829-30 (2002) (internal citations and alterations omitted).

T.M. alleges that after arriving late to school, he was pulled out of his first class and escorted to the office for questioning. ECF No. [8] ¶ 31. When he arrived at the office, another ten to fifteen students (not Plaintiffs in this case) were also waiting to be questioned. *Id*. ¶ 32. T.M. then alleges that he was taken into the office and an unidentified faculty member searched his backpack. *Id*. ¶ 33. Thereafter, Peterson allegedly also searched his backpack, removed $200 from the backpack, detained T.M. for an hour, and conducted an interrogation. *Id*. ¶¶ 35-36. Even though T.M. explained to Peterson that he had the money to take his girlfriend to a Valentine's Day dinner after school, Peterson accused T.M. of selling drugs and did not immediately return the money. Instead, he placed it in an envelope and stated that only T.M.'s mother could pick it up. *Id*. ¶¶ 37-38, 42. Peterson then called T.M.'s mother, who confirmed T.M.'s explanation regarding the money. *Id*. ¶ 45. Peterson eventually returned the money to T.M. *Id*. ¶ 49. As a result, T.M. asserts three claims for violation of his Fourth Amendment rights – unlawful detention, unlawful search of the backpack, and unlawful seizure of the money.

### a. Detention, Search, and Seizure by Peterson

Peterson argues that no Fourth Amendment violation occurred because the search and T.M.'s detention were based on reasonable suspicion, since the First Amended Complaint affirmatively establishes that T.M. was suspected of selling drugs and that he possessed $200.[3]

---

[3] However, the Court notes that before even reaching the question of whether Peterson's actions were justified at their inception, as alleged in the First Amended Complaint, T.M.'s removal from class, initial detention, and search were not conducted by Peterson. Indeed, T.M. alleges that he, like the other ten to fifteen students, was called into the office individually, interrogated and searched by a "member of the school's staff," and then his backpack was searched by

However, the Court does not agree. Specifically, T.M. alleges that after initial interrogation and search by staff and faculty, he was then detained by Peterson, who took the $200 from his backpack, and accused T.M. of selling drugs. *Id.* ¶¶ 35-39.[4] Thus, as alleged in the First Amended Complaint, Peterson simply accused T.M. of selling drugs, and he offers no reasonable basis to conclude that the accusation arose as a result of any particular reason. To the extent that Peterson suggests that mere possession of $200 provided a basis for Peterson's search and detention of T.M., the Court is unpersuaded at this juncture. The mere possession of money alone does not violate the law or a school rule. Notably, T.M. has not alleged that Peterson suspected him of anything, but instead simply accused him of selling drugs based upon finding and removing $200 from T.M.'s backpack. Furthermore, T.M. also alleges that he was late to school that day, and that during his encounter, upon Peterson's demand that T.M. name to whom he sold, he explained that he was late and would therefore have been unable to sell anything to anyone. ECF No. [8] ¶¶ 39-40.

In general, "[a] student's privacy interest is limited in a public school environment where the State is responsible for maintaining discipline, health, and safety." *Earls*, 536 U.S. at 830. And, "[s]ecuring order in the school environment sometimes requires that students be subjected to greater controls than those appropriate for adults." *Id.* at 831. However, those controls cannot be limitless. Here, T.M. maintains that there was no basis for Peterson's accusation. Thus, the

---

faculty, before any encounter with Peterson. ECF No. [8] ¶¶ 32-33. As such, to the extent that T.M.'s claim depends upon the initial removal from class, search, and detention by unnamed members of the school's staff or faculty, there is no basis for a claim that Peterson is liable for the actions of others or for the actions of an unnamed member of the school's staff or faculty.

[4] T.M. also asserts that Peterson sent T.M. to in-school suspension for possessing late passes in his bag, which is against school policy, ECF No. [8] ¶ 48; however, T.M. does not appear to challenge this particular action by Peterson.

Court cannot say that Peterson's actions in searching T.M. were reasonable under the circumstances.

As a result, the Court also cannot say that T.M.'s detention was justified at its inception, since, as alleged, there was no basis for Peterson's accusation. *See Ziegler*, 831 F.3d at 1322-23 ("The initial detention of the students on the party bus for breathalyzer testing meets the *T.L.O.* standard of being justified at its inception, because it was reasonably related to the circumstances that caused the detention: to determine if students on the party bus had been drinking.") (citation omitted). In *Ziegler*, the circumstances that necessitated the initial determination of whether the students had been drinking was the discovery of an empty champagne bottle and twelve cups inside the party bus. 831 F.3d at 1316; *see also Roy ex rel. Roy v. Fulton Cty. Sch. Dist.*, 509 F. Supp. 2d 1316, 1322 (N.D. Ga. 2014) (finding that a search is reasonable when based upon a direct tip). Here, the only circumstance alleged to have given rise to the need to detain T.M. is T.M.'s possession of $200.

Finally, T.M.'s claim regarding seizure of the $200 may proceed for similar reasons. "A 'seizure' of property occurs when there is some meaningful interference with an individual's possessory interests in that property." *United States v. Jacobsen*, 466 U.S. 109, 113 (1984) (citations omitted). "[A] seizure lawful at its inception can nevertheless violate the Fourth Amendment because its manner of execution unreasonably infringes possessory interests protected by the Fourth Amendment's prohibition on 'unreasonable seizures.'" *Id*. at 124. In order to determine the reasonableness of an infringement upon possessory interests, the Court "must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *Id*. at 125 (quoting *United States v. Place*, 462 U.S. 696, 703 (1983)). Here, there seems to be no

dispute that there was an interference with T.M.'s possessory interests in the $200. Nonetheless, Peterson suggests that the money he seized was returned, and therefore that the unlawful seizure claim is disingenuous. However, Peterson fails to support this assertion with citation to relevant authority. *See Phillips v. Hillcrest Med. Ctr.*, 244 F.3d 790, 800 n.10 (10th Cir. 2001) ("A litigant who fails to press a point by supporting it with pertinent authority, or by showing why it is sound despite a lack of supporting authority or in the face of contrary authority, forfeits the point. The court will not do his research for him." (internal quotations omitted)).

Indeed, as alleged, the basis for Peterson's search was not reasonable, and therefore, the Court cannot find at this juncture that there was a governmental interest sufficient to justify any intrusion upon T.M.'s possessory interest in the $200. *Cf. Jacobsen*, 466 U.S. at 125 ("since the property had already been lawfully detained, the 'seizure' could, at most, have only a *de minimis* impact on any protected property interest.").

### b. Peterson is not entitled to qualified immunity at this stage

Peterson next argues that he is entitled to qualified immunity because the totality of the circumstances unequivocally demonstrate that he had arguable reasonable suspicion to believe that T.M. was complicit in criminal activity. However, for the same reasons that the Court does not dismiss T.M.'s claims, qualified immunity does not shield Peterson at this juncture. Significantly, as pled, Peterson's unfounded accusation cannot form the basis for arguable reasonable suspicion.

### c. T.M. cannot state a claim for municipal liability against the County

The County seeks dismissal of T.M.'s claims arguing that it cannot be liable for the actions of Peterson, a Sheriff's deputy, because the County does not control the Sheriff's law enforcement actions, and for failure to allege a municipal policy, practice, or custom.

According to the Supreme Court, § 1983 "cannot be easily read to impose liability vicariously on governing bodies solely on the basis of the existence of an employer-employee relationship with a tortfeasor." *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 692 (1978). "[I]n order to be held liable for a § 1983 violation, a municipality must be found to have itself caused the constitutional violation at issue . . . ." *Skop v. City of Atlanta, Ga.*, 485 F.3d 1130, 1145 (11th Cir. 2007) (citation omitted); *see also City of Canton v. Harris*, 489 U.S. 378, 385 (1989) ("[A] municipality can be found liable under § 1983 only where the municipality *itself* causes the constitutional violation at issue. *Respondeat superior* or vicarious liability will not attach under § 1983." (internal citation omitted) (emphasis in original)). Thus, the constitutional deprivation must come at the hands of an official policy or "custom." *See Monell*, 426 U.S. at 690 (stating that local governing bodies may be subject to liability under § 1983 where "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers"). "[T]he touchstone of the § 1983 action against a government body is an allegation that official policy is responsible for a deprivation of rights protected by the Constitution . . . ." *Id*. Ultimately, a county can never be liable under § 1983 for the acts of those officials whom a county has no authority to control. *Turquitt v. Jefferson Cty., Ala*, 137 F.3d 1285, 1292 (11th Cir. 1998).

In support of his theory that the County should be held liable for Peterson's actions, T.M. argues that Florida's Constitution labels sheriffs as "county officers" and authorizes counties to abolish the office of sheriff, the County has superior control over the Sheriff than does the State, the County funds the Sheriff, and the State is not responsible for judgment against the Sheriff. However, T.M.'s arguments miss the mark, and his reliance upon *Abusaid v. Hillsborough Cty.*

*Bd. of Cty. Comm'rs*, 405 F.3d 1298 (11th Cir. 2005) and *Stanley v. Israel*, 843 F.3d 920 (11th Cir. 2016) is misplaced, because both arose in the context of a claim for Eleventh Amendment immunity, and neither case considered a sheriff's law enforcement functions. *See Abusaid*, 405 F.3d at 1303 (considering whether Florida sheriff entitled to Eleventh Amendment immunity when enforcing county ordinance); *Stanley*, 843 F.3d at 924 (considering whether Florida sheriff entitled to Eleventh Amendment immunity when acting in capacity of chief correctional officer). Significantly, there is no claim of Eleventh Amendment immunity in the instant case, and T.M. does not dispute that Peterson is an employee of the Sheriff and that he was performing in a law enforcement capacity.

"A sheriff's policy or act cannot be said to speak for the county if the county has no say in what policy or action the sheriff takes." *Grech*, 335 F.3d at 1331. "In Florida, a county has no authority and control over a sheriff's law enforcement function." *Troupe v. Sarasota Cty., Fla.*, No. 8:02-cv-53-T-24MAP, 2004 WL 5572030, at *11 (M.D. Fla. Jan. 22, 2004)); *see also Nix v. Cty. of Sarasota*, No. 8:16-cv-3435-T-17AAS, 2017 WL 1106098, at *2 (M.D. Fla. Mar. 21, 2017) (same).[5] Thus, "[h]olding counties liable in the absence of control over sheriffs would ignore *Monell*'s conception of counties as corporations, would substitute a conception of counties as mere units of geography, and would impose even broader liability than the respondeat superior liability rejected in *Monell*." *Grech*, 335 F.3d at 1331. Therefore, T.M. cannot state a claim against the County based upon Peterson's actions.

---

[5] *But see C.P. by and though Perez v. Collier Cty.*, 145 F. Supp. 3d 1085, 1097-98 (M.D. Fla. 2015) (denying county's motion to dismiss based upon Eleventh Circuit law that states in summary fashion that the county is the entity financially liable in official capacity suits against a sheriff) (citing *Adcock v. Baca*, 157 F. App'x 118, 119 (11th Cir. 2005) and *Cook ex rel. Estate of Cook v. Sheriff of Monroe Cty., Fla.*, 402 F.3d 1092, 1115 (11th Cir. 2005)). Upon review, however, the Court finds *C.P.* inapposite, since the respective counties were the only defendants in *Adcock* and *Cook*. In contrast, here, T.M.'s claims against Peterson in his law enforcement capacity survive.

Even assuming T.M.'s claims against the County were proper, T.M. fails to allege a policy, custom, or practice. "A plaintiff . . . has two methods by which to establish a [municipal actor's] policy: identify either (1) an officially promulgated [ ] policy; or (2) an unofficial custom or practice of the county shown through the repeated acts of a final policymaker for the [municipal actor]." *Grech v. Clayton Cty., Ga.*, 335 F.3d 1326, 1329 (11th Cir. 2003). "To establish a policy or custom, it is generally necessary to show a persistent and wide-spread practice[; h]owever, the custom need not receive formal approval." *Depew v. City of St. Marys, Ga.*, 787 F.2d 1496, 1499 (11th Cir. 1986); *see also Smith v. Mercer*, 572 F. App'x 676, 679 (11th Cir. 2014) ("A plaintiff must identify a 'consistent and widespread practice' of constitutional deprivations to prove local government liability for an unofficial custom."); *Carter v. Columbus Consol. Gov't*, 559 F. App'x 880, 881 (11th Cir. 2014) ("the challenged practice or custom must be 'so pervasive as to be the functional equivalent of a formal policy'") (quoting *Grech*, 335 F.3d at 1330 n.6); *Griffin v. City of Opa-Locka*, 261 F.3d 1295, 1308 (11th Cir. 2001) ("[T]o prove § 1983 liability against a municipality based on custom, a plaintiff must establish a widespread practice . . . .").

In support of his claims, T.M. provides only conclusory allegations regarding policy practice or custom and no sets forth no facts. *See, e.g.* ECF No. [8] ¶¶ 104-05, 115-16, 126-27 ("Defendants . . . engaged in conduct that constituted a custom, usage, practice or procedure or rule of the respective municipality/authority."). Accordingly, these allegations fall woefully short of stating a plausible claim for municipal liability against the County.

### d. Leave to Amend

Generally, Rule 15 of the Federal Rules of Civil Procedure governs amendment to pleadings. Apart from initial amendments permissible as a matter of course, "a party may amend

its pleading only with the opposing party's written consent or the court's leave." Fed. R. Civ. P. 15(a)(2). "The court should freely give leave when justice so requires." *Id.* However, "[a] district court need not . . . allow an amendment (1) where there has been undue delay, bad faith, dilatory motive, or repeated failure to cure deficiencies by amendments previously allowed; (2) where allowing amendment would cause undue prejudice to the opposing party; or (3) where amendment would be futile." *Bryant v. Dupree*, 252 F.3d 1161, 1163 (11th Cir. 2001). The law in this Circuit is clear that "a district court may properly deny leave to amend the complaint under Rule 15(a) when such amendment would be futile." *Hall v. United Ins. Co. of Am.*, 367 F.3d 1255, 1263 (11th Cir. 2004); *see also Williams v. Bd. of Regents of Univ. Sys. of Ga.*, 477 F.3d 1282, 1292 n.6 (11th Cir. 2007) (same); *Thompson v. City of Miami Beach, Fla.*, 990 F. Supp. 2d 1335, 1343 (S.D. Fla. 2014) ("[A] district court may properly deny leave to amend the complaint under Rule 15(a) when such amendment would be futile.") (citation omitted).

"[D]enial of leave to amend is justified by futility when the 'complaint as amended is still subject to dismissal.'" *Burger King Corp. v. Weaver*, 169 F.3d 1310, 1320 (11th Cir. 1999); *see Dysart v. BankTrust*, 516 F. App'x 861, 865 (11th Cir. 2013) (same); *St. Charles Foods, Inc. v. America's Favorite Chicken Co.*, 198 F.3d 815, 822-23 (11th Cir. 1999) ("When a district court denies the plaintiff leave to amend a complaint due to futility, the court is making the legal conclusion that the complaint, as amended, would necessarily fail."); *Christman v. Walsh*, 416 F. App'x 841, 844 (11th Cir. 2011) ("A district court may deny leave to amend a complaint if it concludes that the proposed amendment would be futile, meaning that the amended complaint would not survive a motion to dismiss."); *Aguilar v. United Floor Crew, Inc.*, No. 14-cv-61605, 2014 WL 6751663, at *2 (S.D. Fla. Dec. 1, 2014) (same). In any event, "the grant or denial of

an opportunity to amend is within the discretion of the District Court . . . ." *Foman v. Davis*, 371 U.S. 178, 182 (1962).

Because the Court has determined that no Fourteenth Amendment violations occurred, and that Plaintiffs lack standing with respect to their First Amendment claim, further amendment of these claims would be futile.

## IV. CONCLUSION

For the reasons set forth, the Motions filed by Medina, Runcie, Israel and Jordan, and the County, **ECF Nos. [16], [27], [33], [40]**, are **GRANTED**, and the claims against them are **DISMISSED WITH PREJUDICE**. The Motion filed by Peterson, **ECF No. [42]**, is **GRANTED IN PART AND DENIED IN PART**, in that Count IV is **DISMISSED WITH PREJUDICE**, and Peterson's Motion with respect to Counts I, II, and III is **DENIED**. Peterson shall file an Answer **on or before December 21, 2018**.

**DONE AND ORDERED** in Chambers at Miami, Florida, this 12th day of December, 2018.

_____
**BETH BLOOM**
**UNITED STATES DISTRICT JUDGE**

Copies to:

Counsel of Record

21