# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No. 18-cv-61577-BLOOM/Valle

L.S., a minor by her mother and
next friend YASMIN LORENA
HERNANDEZ, *et al.*,

      Plaintiffs,

v.

SCOT PETERSON, *et al.*,

      Defendants.

_____/

## ORDER ON MOTION FOR FINAL SUMMARY JUDGMENT

**THIS CAUSE** is before the Court upon Defendant Scot Peterson's ("Defendant" or "Peterson") Motion for Final Summary Judgment, ECF No. [82] ("Motion"), filed on September 16, 2019. The Court has carefully considered the Motion, all opposing and supporting submissions, including Plaintiff T.M.'s ("Plaintiff" or "T.M.") Response, ECF No. [87], and Peterson's Reply, ECF No. [89][1], the record in this case, the applicable law, and is otherwise fully advised. For the reasons that follow, the Motion is granted.

## I.    INTRODUCTION

This case involves claims by T.M., a student at Marjory Stoneman Douglas High School ("MSD"), for violations of his Fourth Amendment right to be free from an unreasonable searche and seizure. In the Amended Complaint, ECF No. [8], T.M. asserts three counts against Peterson for violations of his Fourth Amendment rights relating to his unlawful detention (Count 1), the

---

[1] Peterson filed an initial reply, ECF No. [88], and thereafter, a corrected reply, ECF No. [89], to properly number the headings appearing on pages 3 and 6. The corrected reply incorporates no substantive changes.

unlawful search of T.M.'s backpack (Count 2), and the unlawful seizure of money from T.M.'s backpack (Count 3). Peterson now moves for summary judgment on each of T.M.'s claims.

## II.     RELEVANT FACTS

T.M. was a student enrolled at MSD. Defendant's Statement of Undisputed Material Facts ("Def. SOMF"), ECF No. [83] ¶ 1.[2] At the time, Defendant Scot Peterson was the Broward Sheriff's Office deputy assigned as School Resource Officer ("SRO") at MSD. *Id.* ¶ 2. Approximately two days before the alleged violations occurred on February 14, 2018, MSD security staff found a female student in possession of a "vape" pen on the MSD campus. *Id.* ¶ 4. Kelvin E. Greenleaf ("Greenleaf"), a Security Specialist at MSD, met with the female student and her parents at MSD the next day. *Id.* ¶¶ 2, 7. During the meeting, the female student identified T.M. as one of the students involved in selling or distributing vapes and other contraband, including drugs. *Id.* ¶ 7. The use and sale of "vape" pens and vaping paraphernalia have become a significant problem at MSD and other high school campuses, and the use and possession of these items is prohibited on the MSD campus. *Id.* ¶¶ 5-6.

On the morning of February 14, 2018, security personnel escorted each of the students identified by the female student, including T.M., to a room in the MSD administration building. *Id.* ¶ 9. Greenleaf interviewed each of the students and searched their backpacks and belongings for contraband. *Id.* ¶ 10. Greenleaf interviewed T.M. and searched his backpack. *Id.* ¶ 11. In the backpack, Greenleaf found cash totaling approximately $200.00 in denominations of $1 and $5 bills, wrapped with a rubber band. *Id.* In Greenleaf's experience, high school students carrying significant amounts of cash in small bills are often collecting money and making change for the purchase and sale of drugs, vapes, and other contraband. *Id.* ¶ 12. It is Greenleaf's standard practice

---

[2] Where a material fact is uncontroverted by the opposing party, the Court cites only to the originating Statement of Facts.

upon finding such money, whether or not he discovers contraband as well, to take the student to the School Resource Officer ("SRO"), in this case Defendant Peterson, for an additional interview. *Id*.

After finding the money in T.M.'s backpack, Greenleaf then escorted T.M. to Peterson's office, carrying T.M.'s backpack and the money, and sat T.M. in a chair in front of the desk. *Id*. ¶ 14. The parties disagree with respect to the course of events once T.M. arrived in Peterson's office. According to T.M., he was placed alone in Peterson's office. His backpack, with the money in it, was placed on the floor. Plaintiff's Additional Undisputed Facts ("Pl. SOMF"), ECF No. [87-1] at 8 ¶ 3. A few minutes later, Peterson entered the office and immediately picked up T.M.'s backpack and began to search it. *Id*. ¶ 4. Peterson found the money and emptied the rest of the contents of T.M.'s backpack. *Id*. ¶ 5.

The parties do not dispute the following facts. Greenleaf told Peterson what had occurred, including the female student's identification of T.M. as selling or distributing vapes, drugs, or other contraband, and that Greenleaf found the cash in T.M.'s backpack. Def. SOMF ¶ 15. Greenleaf also conveyed to Peterson his suspicion that T.M. might be involved in selling drugs or drug paraphernalia or vapes on campus. *Id*. ¶ 16. When Peterson asked T.M. where he had gotten the roll of cash and why he had such a large amount, T.M. answered that his mother had given him the cash to take his girlfriend to dinner for Valentine's Day. *Id*. ¶ 17.

The parties disagree as to what happened next. According to T.M., Peterson called his mother and she confirmed that she had given T.M. the money. Pl. SOMF ¶ 8. After Peterson had finished speaking to T.M.'s mother, Peterson kept T.M. in the office accusing him of things and stating that Peterson was going to search every student in T.M.'s gym class to be able to expel him, and Peterson told T.M. that his mother would have to come and get the money. *Id*. ¶ 10.

Peterson kept T.M. in his office for another forty-five minutes, looking up T.M.'s transcripts, telling T.M. that he did not like students like T.M., that he wanted to get T.M. expelled, and that T.M. had the money because T.M. was selling drugs. *Id.* ¶¶ 11-12. Eventually, Peterson yelled out of his door that he was done with T.M. and for school officials to take T.M. to internal suspension. *Id.* ¶ 13. Peterson's testimony and T.M.'s testimony are inconsistent as to when Peterson returned the money. However, the parties do not dispute that the money was returned to T.M. *Id.* ¶ 14; Def. SOMF ¶ 19.

Peterson ultimately determined that there was no probable cause either to seize T.M.'s cash or to arrest him. School security officials thereafter escorted T.M. from Peterson's office. Def. SOMF ¶ 20.

### III. LEGAL STANDARD

A court may grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The parties may support their positions by citation to the record, including, *inter alia*, depositions, documents, affidavits, or declarations. *See* Fed. R. Civ. P. 56(c). An issue is genuine if "a reasonable trier of fact could return judgment for the non-moving party." *Miccosukee Tribe of Indians of Fla. v. United States*, 516 F. 3d 1235, 1243 (11th Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986)). A fact is material if it "might affect the outcome of the suit under the governing law." *Id.* (quoting *Anderson*, 477 U.S. at 247-48). The court views the facts in the light most favorable to the non-moving party and draws all reasonable inferences in the party's favor. *Davis v. Williams*, 451 F.3d 759, 763 (11th Cir. 2006); *see also Crocker v. Beatty* , 886 F.3d 1132, 1134 (11th Cir. 2018) ("[W]e accept [the non-movant's] version of the facts as true and draw all reasonable inferences in the light most favorable

to him as the non-movant."). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which a jury could reasonably find for the [non-moving party]." *Anderson*, 477 U.S. at 252. "If more than one inference could be construed from the facts by a reasonable fact finder, and that inference introduces a genuine issue of material fact, then the district court should not grant summary judgment." *Bannum, Inc. v. City of Fort Lauderdale*, 901 F.2d 989, 996 (11th Cir. 1990). The Court does not weigh conflicting evidence. *See Skop v. City of Atlanta, Ga.*, 485 F.3d 1130, 1140 (11th Cir. 2007) (quoting *Carlin Comm'n, Inc. v. S. Bell Tel. & Tel. Co.*, 802 F.2d 1352, 1356 (11th Cir. 1986)).

The moving party shoulders the initial burden to demonstrate the absence of a genuine issue of material fact. *Shiver v. Chertoff*, 549 F.3d 1342, 1343 (11th Cir. 2008). If a movant satisfies this burden, "the non-moving party 'must do more than simply show that there is some metaphysical doubt as to the material facts.'" *Ray v. Equifax Info. Servs.*, L.L.C., 327 F. App'x 819, 825 (11th Cir. 2009) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). Instead, "the non-moving party 'must make a sufficient showing on each essential element of the case for which he has the burden of proof.'" *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). The non-moving party must produce evidence, going beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designating specific facts to suggest that a reasonable jury could find in the non-moving party's favor. *Shiver*, 549 F.3d at 1343. But even where an opposing party neglects to submit any alleged material facts in controversy, a court cannot grant summary judgment unless it is satisfied that all of the evidence on the record supports the uncontroverted material facts that the movant has proposed. *Reese v. Herbert*, 527 F.3d 1253, 1268-69, 1272 (11th Cir. 2008); *United*

*States v. One Piece of Real Prop. Located at 5800 S.W. 74th Ave., Miami, Fla.*, 363 F.3d 1099, 1103 n.6 (11th Cir. 2004).

## IV. DISCUSSION

In the Motion, Defendant requests summary judgment in his favor. As to Counts I and III, Defendant claims that the undisputed facts establish that Peterson did not detain T.M., and did not seize T.M.'s money. As to all Counts, Defendant claims that Peterson had arguable reasonable suspicion to detain T.M., search his backpack, and temporarily seize his money. As a result, Defendant argues that Peterson is entitled to qualified immunity. Because the issue of qualified immunity is dispositive, the Court considers it first.

"Qualified immunity offers complete protection for government officials sued in their individual capacities if their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Kingsland v. City of Miami*, 382 F.3d 1220, 1231 (11th Cir. 2004) (quoting *Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir. 2002)); *see also Storck v. City of Coral Springs*, 354 F.3d 1307, 1313 (11th Cir. 2003). "The purpose of this immunity is to allow government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation, protecting from suit all but the plainly incompetent or one who is knowingly violating the federal law," *Wood v. Kesler*, 323 F.3d 872, 877 (11th Cir. 2003) (quoting *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002)), and the doctrine accordingly represents "a balance between the need for a remedy to protect citizens' rights and the need for government officials to perform their duties without the fear of constant, baseless litigation." *Kingsland*, 382 F.3d at 1231 (citation omitted). Accordingly, "[q]ualified immunity is, as the term implies, qualified. It is not absolute." *Id.* at 1233.

"To receive qualified immunity, 'the public official must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." *Id.* at 1232 (quoting *Lee*, 284 F.3d at 1194); *see also O'Rourke v. Hayes*, 378 F.3d 1201, 1205 (11th Cir. 2004) ("To be even potentially eligible for qualified immunity, the official has the burden of establishing that he was acting within the scope of his discretionary authority.") (citation omitted). In the instant case and based on the undisputed facts, there is no dispute that Peterson was acting within the scope of his discretionary authority in investigating a potential violation of school rules and possibly, a violation of law.

Once a defendant raises the issue of qualified immunity and demonstrates that the acts complained of were committed within the scope of his discretionary authority, "the burden then shift[s] to the [plaintiff] to show that qualified immunity should not apply because: (1) the officers violated a constitutional right; and (2) that right was clearly established at the time of the incident." *Garczynski v. Bradshaw*, 573 F.3d 1158, 1166 (11th Cir. 2009). The Supreme Court has outlined a two-part test to determine whether a plaintiff meets his burden: (1) "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?"; and (2) if a constitutional right would have been violated under the plaintiff's version of the facts, the court must then determine "whether the right was clearly established." *Saucier v. Katz*, 533 U.S. 194, 201 (2001). "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." *Id.*

### A. Violation of a constitutional right

Plaintiff contends that Defendant violated his Fourth Amendment rights at two distinct points in time. The first point in time is the initial detention of T.M. and search of his backpack.

The second point in time is the continued detention of T.M. and seizure of his money after Peterson found no illegal or banned substances in his backpack, or once T.M.'s mother confirmed the truthfulness of T.M.'s explanation to Peterson.

It is well established that the Fourth Amendment applies to searches and seizures conducted by school authorities. *New Jersey v. T.L.O.*, 469 U.S. 325, 337 (1985); *see also Ziegler v. Martin Cty. Sch. Dist.*, 831 F.3d 1309, 1319 (11th Cir. 2016) (noting that the "applicable reasonableness principles guide" the analysis of searches and seizures). However, school officials do not need to obtain a warrant before searching a student under their authority. *T.L.O.*, 469 U.S. at 340. "[T]he legality of a search of a student should depend simply on the reasonableness, under all the circumstances, of the search." *Id.* at 341. The determination involves a two-part inquiry: "first, one must consider whether the action was justified at its inception [and] second, one must determine whether the search as actually conducted was reasonably related in scope to the circumstances which justified the interference in the first place." *Id.* Thus "[u]nder ordinary circumstances, a search of a student by a teacher or other school official will be 'justified at its inception' when there are reasonable grounds for suspecting that the search will turn up evidence that the student has violated or is violating either the law or the rules of the school." *Id.* at 341-42. Overall, "[w]hile schoolchildren do not shed their constitutional rights when they enter the schoolhouse, Fourth Amendment rights are different in public schools than elsewhere; the reasonableness inquiry cannot disregard the schools' custodial and tutelary responsibility for children." *Bd. of Educ. of Indep. Sch. Dist. No. 92 of Pottawatomie Cty. v. Earls*, 536 U.S. 822, 829-30 (2002) (internal citations and alterations omitted).

### i. Initial detention of T.M. and search of his backpack

Upon review of the record, the Court finds that Peterson's initial detention of T.M. and search of his backpack did not violate T.M.'s Fourth Amendment rights.[3] First, T.M.'s encounter with Peterson formed part of a wider investigation into allegations of the sale of drugs or other prohibited items at MSD. It is undisputed that Greenleaf told Peterson about the female student's identification of T.M. as selling or distributing vapes, drugs, or other contraband, and that Greenleaf found the cash in T.M.'s backpack. It is also undisputed that Greenleaf conveyed to Peterson his suspicion that T.M. might be involved in selling drugs, drug paraphernalia or vapes on campus. Accordingly, Peterson had reasonable grounds for suspecting that a search would produce evidence that T.M. was violating school rules or the law. The resulting detention of T.M. and search of his backpack were reasonably related in scope to the circumstances and the continuing investigation. *T.L.O.*, 469 U.S. at 341-42. Plaintiff concedes as much by admitting the material facts that Greenleaf conveyed to Peterson before Peterson's interactions with T.M.: a female student identified T.M. as someone who was selling or distributing vapes, drugs or other contraband; Greenleaf found approximately $200.00 in denominations of $1 and $5 bills; and Greenleaf suspected that T.M. might be involved in selling drugs, drug paraphernalia or vapes on campus. *See* Pl. SOMF ¶¶ 7, 11-12, 15. Thus, the initial detention of T.M. was justified as Peterson had reasonable grounds for suspecting that the search of T.M.'s backpack would turn up evidence that he violated or was violating either the law of the rules of the school. *Id.* As such, the Court finds that there was no violation of T.M.'s Fourth Amendment rights in Peterson's initial detention of T.M. for questioning and the search of his backpack.

---

[3] The Court notes that Peterson disputes Plaintiff's assertion that he searched T.M.'s backpack at any point, but for purposes of its analysis, the Court will assume that he did.

### ii. Continued detention of T.M. and seizure of his money

T.M. argues that once Peterson spoke to T.M.'s mother and confirmed that she gave T.M. the money, it was a violation of T.M.'s Fourth Amendment rights to continue to detain T.M. and his money in the office. T.M. relies on *Ziegler v. Martin Cty. Sch. Dist.*, 831 F.3d 1309 (11th Cir. 2016) in support of his argument. In *Ziegler*, a group of students arrived late to their school prom in violation of school prom rules in a party bus. 831 F.3d at 1315, 1318. Upon discovery of an empty champagne bottle and twelve cups inside the party bus by a school official, the students were kept outside the prom to be breathalyzed. *Id.* at 1316-1317. Each of the students were breathalyzed, and none were allowed to leave until all had submitted to the test. *Id.* at 1317. The students in *Ziegler* claimed that their Fourth Amendment rights were violated, in pertinent part, by being breathalyzed and seized before and after the administration of the breathalyzer tests. *Id.*

The court in *Ziegler* determined that the initial detention of the students on the party bus for breathalyzer testing was justified at its inception because it was reasonably related to the circumstances that caused the detention—to determine whether the students had been drinking. *Id.* at 1322-23. However, the court further determined that once a student had tested alcohol or drug free, there was no justification for continuing to detain the student because the continued detention was no longer reasonably related to the initial reason for the detention—to determine if the student had been drinking. *Id.* at 1325.

Here, it is undisputed that the circumstances that led to T.M.'s initial detention by Peterson was to continue the investigation and the need to determine whether T.M. was involved in the purchase or sale of prohibited items at the school. This was based upon the direct identification of T.M. by another student. *See C.B. v. Driscoll*, 82 F.3d 383, 388 (11th Cir. 1996) (a tip from a fellow student provides reasonable grounds for search). T.M. argues that once Peterson spoke to

T.M.'s mother, who confirmed that she gave T.M. the money, the continued detention of T.M. was not reasonably related to the initial reason for detaining him—to determine whether he was buying or selling prohibited items. The Court disagrees.

In this case, unlike a 0.0 breathalyzer test reading, T.M.'s mother's statement was not conclusive evidence exonerating T.M. Indeed, T.M.'s mother's confirmation answered only the question of where the money came from. It did not address the ultimate question of whether T.M. was participating in buying or selling prohibited items. Peterson testified that T.M. was being evasive and deceptive. ECF No. [83-4] at 46-47, 49. As T.M. himself recognized in his deposition testimony, "my mom kind of was sticking up for me obviously, as a mom would . . . ." ECF No. [83-3] at 44:15-16. As a result, the Court cannot say that Peterson's continued detention of T.M. in the office after speaking to his mother violated T.M.'s Fourth Amendment rights. The parties do not dispute that the ultimate purpose of the detention was to determine if T.M. was buying or selling prohibited items. As such, there is no evidence in the record that the explanation given by T.M.'s mother conclusively exonerated T.M, obviating the need to investigate further.

Moreover, the record evidence, considered in the light most favorable to T.M , establishes that Peterson did not keep T.M. in the office for a prolonged period of time after speaking to his mother. T.M. testified that he was in Peterson's office for a total of forty-five minutes. ECF No. [83-3] at 43. T.M. further testified that a total of approximately twenty to twenty-five minutes elapsed from the time Peterson walked into the office until the time Peterson finished speaking to T.M.'s mother, *id*. at 38, and that T.M. was in Peterson's office for another ten minutes after Peterson was finished and before T.M. was taken away, *id*. at 43. Plaintiff does not cite to any authority establishing that such a length of detention is unreasonable, or that a SRO is required to release a student after speaking to a student's parent in such circumstances. Indeed, the Eleventh

Circuit has previously declined to define the reasonableness of a seizure based upon its duration alone. *See Lindsey v. Storey*, 936 F.2d 554, 559 (11th Cir. 1991) ("Where the Supreme Court has chosen to facilitate effective law enforcement by explicitly rejecting a 'bright-line rule' about when a seizure is so lengthy as to require probable cause to be reasonable, we are extremely wary of requiring law enforcement officers to justify a seizure with probable cause unless the length of detention was so prolonged that it falls well outside the range of seizures found under *Terry* [*v. Ohio*, 392 U.S. 1 (1968)] and [*United States v.*] *Place*[, 462 U.S. 696, 709 (1983)].").

In addition, although Plaintiff disputes Peterson's assertion that the money was returned to T.M. before he left Peterson's office, T.M.'s own testimony establishes that Peterson returned the money to T.M. when T.M. left the office. (Q. So the money, the furthest away that it ever got from you was Scot Peterson's desk, right? A. Yeah. He put it in an envelope at one point, but it was on his desk after. Q. It ended up back in your backpack? A. Yes. Q. Did you put it back in or did he put it back in? A. No. He put it back in.) *See* ECF No. [83-3] at 44-45. Thus, Plaintiff's own testimony belies his contention in opposition to the Motion that T.M. had to return to Peterson's office at some later time to retrieve his money. Accordingly, Peterson's retention of T.M.'s money until T.M. left his office, similar to Peterson's continued detention of T.M. in the office after his conversation with T.M.'s mother, did not violate T.M.'s Fourth Amendment rights.

### B. Whether the right was clearly established

Because the Court finds that Peterson's detention of T.M. and T.M.'s money in the office did not violate T.M.'s Fourth Amendment rights, the Court need not engage in further analysis. *Saucier*, 533 U.S. at 201. Nevertheless, even assuming that Peterson's detention of T.M. and his money in the office following the conversation with T.M.'s mother implicated T.M.'s Fourth Amendment rights, Peterson is entitled to qualified immunity. "If a constitutional right would have

been violated under the plaintiff's version of the facts, 'the next, sequential step is to ask whether the right was clearly established.'" *Vinyard*, 311 F.3d at 1346 (quoting *Saucier*, 533 U.S. at 201). As previously noted, a plaintiff must show that the right is clearly established at the time of the violation to overcome qualified immunity. *Garczynski*, 573 F.3d at 1166.

"For an asserted right to be clearly established for purposes of qualified immunity, 'the law must have earlier been developed in such a concrete and factually defined context to make it obvious to all reasonable government actors, in the defendant's place, that what he is doing violates federal law." *Jackson v. Sauls*, 206 F.3d 1156, 1164-65 (11th Cir. 2000) (quoting *Lassiter v. Ala. A&M Univ. Bd. of Trs.*, 28 F.3d 1146, 1149 (11th Cir. 1994)). "A right may be clearly established for qualified immunity purposes in one of three ways: (1) case law with indistinguishable facts clearly establishing the constitutional right; (2) a broad statement of principle within the Constitution, statute, or case law that clearly establishes a constitutional right; or (3) conduct so egregious that a constitutional right was clearly violated, even in the total absence of case law." *Lewis v. City of W. Palm Beach, Fla.*, 561 F.3d 1288, 1291-92 (11th Cir. 2009) (internal citations omitted). "[O]nly Supreme Court cases, Eleventh Circuit caselaw, and [Florida] Supreme Court caselaw can 'clearly establish' law in this circuit." *Thomas ex rel. Thomas v. Roberts*, 323 F.3d 950, 955 (11th Cir. 2003) (citing *Hamilton By & Through Hamilton v. Cannon*, 80 F.3d 1525, 1532 n.1 (11th Cir. 1996)); *see also Ziegler*, 831 F.3d at 1326 n.12. "For a constitutional right to be clearly established, its contours must be sufficiently clear that a reasonable official would understand that what he is doing violates that right; this is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in light of pre-existing law the unlawfulness must be apparent." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (internal quotations and citations omitted).

T.M. argues that *Ziegler* provides fair warning that continuing to detain students once the original reasonable suspicion has dissipated and no new facts emerge to justify the detention, is unreasonable and violates the Fourth Amendment. The Court disagrees.

*Ziegler*'s holding is not as broad as T.M. contends. Specifically, the Eleventh Circuit in *Ziegler* established that "when a student is exonerated by a test with an immediate result, such as a breathalyzer or urine test, that student can no longer be held after being shown to be alcohol or drug free." *Ziegler*, 831 F.3d at 1328. Here, there is no equivalent test with an immediate result that exonerated T.M. As the Court previously noted, T.M.'s mother's confirmation of the source of the funds did not conclusively answer the ultimate question of whether T.M. was participating in the purchase or sale of prohibited items at MSD. Therefore, *Ziegler* does not provide fair warning to Peterson that his continued detention of T.M. or the detention of T.M.'s money would violate T.M.'s Fourth Amendment rights.

Accordingly, Plaintiff has failed to establish that there is law clearly establishing that Peterson's continued detention of T.M. or T.M.'s money after speaking with T.M.'s mother violated T.M.'s Fourth Amendment rights. Peterson is therefore entitled to qualified immunity on T.M.'s claims. *See Thomas*, 323 F.3d at 954 (facts in comparator case so different as to offer little guidance and inadequate warning that conduct is unconstitutional).

## V. CONCLUSION

For the foregoing reasons, Peterson's Motion, **ECF No. [82]**, is **GRANTED**. All remaining deadlines are terminated and any pending hearings are **CANCELED**. Final judgment will be entered by separate order. The Clerk of Court is directed to **CLOSE** this case.

**DONE AND ORDERED** in Chambers at Miami, Florida, on October 25, 2019.

**BETH BLOOM**
**UNITED STATES DISTRICT JUDGE**

Copies to:

Counsel of Record